Argued and submitted March 11, reversed and remanded for further proceedings on petition; cross-petition dismissed as moot July 10, petition for review denied December 17, 1996 (324 Or 487)

## OREGON PUBLIC EMPLOYEES UNION
## LOCAL 503, SEIU,
*Petitioner - Cross-Respondent,*

*v.*

## JUDICIAL DEPARTMENT,
*Respondent - Cross-Petitioner.*

## (RC-13-95; CA A88962)

919 P2d 1200

Lynn-Marie Crider argued the cause and filed the briefs for petitioner - cross-respondent.

Nancy J. Hungerford argued the cause and filed the brief for respondent - cross-petitioner.

Before Riggs, Presiding Judge, and De Muniz and Haselton, Judges.

RIGGS, P. J.

**RIGGS, P. J.**

The Oregon Public Employees Union (OPEU) seeks review of an Employment Relations Board (ERB) order setting aside an election that was held to determine whether OPEU would be the exclusive bargaining representative for certain employees of Oregon's Judicial Department (employer). We reverse and remand.

OPEU filed a petition with ERB, seeking to represent a unit of unrepresented employees of employer. The proposed bargaining unit is described as

> "[a]ll public employees of the Judicial Department of the State of Oregon, excluding judges, appellate law clerks, and supervisory and confidential employees."

OPEU and employer entered into a consent election agreement providing for an election to be conducted by ERB. The agreement provided that ERB would conduct a "secret mail ballot election" to determine whether the affected employees wish to be represented by OPEU for purposes of collective bargaining or to continue being unrepresented. It was further agreed in writing that on April 13, 1995, ERB would mail ballots to eligible employees; ballots would be due in ERB's offices by no later than 5:00 p.m. on April 27, 1995, and ballots would be tallied at 10:00 a.m. the following day.

ERB sent election packets to the home addresses of 1,088 employees who had been identified by the parties as eligible voters. The packets included a ballot, a return envelope, and instructions for voting. Among other things, the instructions said:

> "From the time you receive this mail-in ballot, you should consider yourself as having the same rights and responsibilities as a voter in a voting booth. You should, therefore, mark your ballot in secret, deposit it in the United States Mail, and not discuss it with anyone prior to placing your ballot in the mail."

Voters also were instructed to "seal th[e] envelope, place first class postage on it, and sign your name on the signature line on the outside." Finally, voters were instructed to "place your

sealed and stamped ballot return envelope in the U.S. Mail[.]"

As part of OPEU's campaign to get out the vote, union representatives offered to hand-deliver voters' ballot return envelopes. Hundreds of voters accepted that offer. OPEU contacted ERB's elections coordinator to advise her that the union planned to hand-deliver a large number of ballots to ERB on April 17 and 18. The union official asked at what hour the ballots should be brought in to avoid inconveniencing ERB staff and was told by ERB's elections coordinator to bring the ballots in by 4:00 p.m.

Employer learned of the hand deliveries, and on April 25, 1995, it filed a motion to vacate the election proceedings. ERB denied the motion on the ground that it had no procedure for vacating an election before it was held, but ERB treated the motion as both a post-election objection to the conduct of the election and a post-election challenge to the hand-delivered ballots. OAR 115-25-060(8), (10).

On April 28, 1995, ERB tallied the unchallenged ballots in the presence of representatives of both parties. Of the 1,088 ballots mailed, 968 had been returned to ERB. Of those, 343 had been hand-delivered by OPEU representatives. Employer challenged all of the ballots that had been returned in unpostmarked envelopes. A number of ballots were challenged for other reasons. In all, 558 ballots were *unchallenged*. Of those, the tally showed that 126 had been cast in favor of OPEU representation and 432 had been cast for no representation. Because the number of ballots challenged on the basis of their hand-delivery by OPEU representatives was sufficient to affect the outcome of the election, the results of the election were not certified.

Thereafter, the parties were advised that the challenges needed to be resolved and, if necessary, a second tally needed to be scheduled. In lieu of a hearing, the parties agreed to a record that includes stipulations, exhibits and the affidavit of ERB's elections coordinator. OPEU also sought to include evidence about the practices of the National Labor Relations Board (NLRB) and county clerks in Oregon regarding the return of mail and absentee ballots, but ERB ruled that the evidence was not relevant to its determination in

this case. OPEU submitted an offer of proof that shows a widespread practice of accepting hand-delivered ballots in mail-in elections.

Based on the stipulated record, ERB issued an order on June 8, 1995. It determined that it was not necessary to resolve the challenges that had been made against any ballots other than the 343 ballots challenged by employer for having been hand-delivered by OPEU representatives. It found that in four prior elections, union representatives had hand-delivered small numbers of ballots without complaint, but that employer representatives in those elections had been unaware of the hand-delivered ballots and so "were unable to—and, of course, did not—challenge ballots on that basis." It found that the ballots in those elections also had not been challenged by the ERB elections coordinator.

ERB summarized employer's argument that the election process was "tainted" by OPEU "taking custody and control of hundreds of ballots" and that "the normal safeguards built into the secret ballot election process" had been defeated thereby. The order also summarized OPEU's arguments that no administrative rule prohibits hand delivery of ballots, OPEU representatives have delivered ballots that were counted in prior elections, and OPEU had every reason to believe that its hand-delivered ballots would be counted in the current election.

ERB held that, although it had not adopted a rule prohibiting the hand-delivery of ballots by OPEU agents in mail-ballot elections,

> "[t]he absence of a specific rule proscribing certain conduct * * * does not affect this Board's authority to conclude that such conduct significantly affected the laboratory conditions necessary for a valid representation election."

It opined that the previous instances of counting unchallenged hand-delivered ballots had not established a precedent that was binding on ERB, because ERB "is not 'estopped' from enforcing its rules and applying its case law even where a Board employee has given a party incorrect advice" and because OPEU had not, in any previous election, "made a concerted effort to gain custody of voted ballots, thus causing

a major portion of the electorate to ignore this Board's voting instructions."[1]

ERB's order concluded

"that ballot solicitation by a party to an election is intrinsically coercive and that the maintenance of custody of voted ballots by a party is inherently destructive of the secret ballot concept.

"We find that [employer's] objection to the conduct of the April election has merit and that the challenged ballots should not be tallied." (Footnote omitted.)

ERB set aside the election and ordered a new one to be held "as soon as is practicable." It has delayed the new election pending the outcome of this petition for review.

In its petition for judicial review of ERB's order, OPEU contends that ERB "erred as a matter of law" when it set aside the election on the basis of union's conduct, erred by finding that OPEU's conduct "significantly interfered" with the secret ballot process without any supporting evidence, erred in ruling that evidence of other entities' election practices was irrelevant and erred in failing to conduct a tally of the challenged ballots. OPEU urges us to reverse the order and remand the case for ERB to count the challenged ballots, prepare a revised tally and certify the results of the April 27, 1995, election.

Employer would have us affirm the portion of the order that invalidated the challenged ballots, but in a cross-petition, it challenges ERB's determination that a new election should be held as soon as possible; employer contends that a one-year delay is required. However, that issue is moot because the one year has already elapsed.[2] Accordingly, we need not discuss it. Employer also submits that ERB should have certified the results of the election as one for "no representation," based on its tally of the unchallenged ballots.

---

[1] ERB has a demonstrated practice of deciding what is proscribed conduct on a case-by-case basis, and the parties do not contend that that practice violates ERB's delegated authority or any rule of law. *See* ORS 243.766(2) (ERB shall resolve disputes with respect to the conduct of elections).

[2] Oral argument in this case was held on March 11, 1996, and this opinion is being issued after April 25, 1996.

Before considering the merits of this case, we address the threshold question of whether the order issued by ERB is a "final" one. If it is not final, then it is not reviewable by this court. *City of Hermiston v. ERB*, 280 Or 291, 293-94, 570 P2d 663 (1977).

The ERB order itself states:

"Because further proceedings concerning this matter are pending before this agency, *this Order is not a final order that may be appealed* pursuant to ORS 183.482."[3] (Emphasis supplied.)

From the record, it appears that those "further proceedings" concern the separate question of whether 31 of the employees who voted in the election are in fact supervisory or confidential employees and therefore are not members of the agreed bargaining unit. The parties do not explain, and it is not apparent to us, how the eventual resolution of that unrelated question will have any bearing on ERB's decision to set aside this election on the basis of OPEU's hand-delivery of ballot envelopes.

■      To decide whether ERB's order is final, we first determine the nature of its official action, that is, the procedural context in which its action took place and the legal effect of its order. *Klamath Co. v. Laborers Inter. Union*, 21 Or App 281, 284, 286-88, 534 P2d 1169 (1975). In *Klamath Co.*, the question was whether an order issued by ERB (then known as "PERB"), determining that a group of employees in

---

[3] ORS 183.480(1) provides, in part:

"Any person adversely affected or aggrieved by an order or any party to an agency proceeding is entitled to judicial review of a final order[.]"

ORS 183.310(5)(b) provides:

" 'Final order' means final agency action expressed in writing. 'Final order' does not include any tentative or preliminary agency declaration or statement that:

"(A)   Precedes final agency action; or

"(B)   Does not preclude further agency consideration of the subject matter of the statement or declaration."

ORS 183.482 sets forth the procedure for filing a petition for judicial review, the rules relating to staying enforcement of an agency order, and the scope and nature of this court's review of a petition for judicial review.

the county assessor's office constituted an appropriate bargaining unit and ordering an election, was a "final" order. Our opinion summarized the applicable administrative rules and statutes and chronicled the procedure by which public employees may elect to be represented by a union, from the union's filing of a petition for certification of an exclusive bargaining representative, to the proposal and designation of the members of the unit, to the election itself and post-election challenges. We held that ERB's order in that case was *not* a final order, because (a) the designation of an appropriate bargaining unit was "but one step in the process of certifying a bargaining agent," *id.* at 286; (b) the designation, which was challenged by the employer, would have no legal effect if the employees voted for *no* representation, because having "won" the election, the employer would have no need to challenge ERB's order; and (c) if the employees voted *for* union representation, the employer would then be able to object to ERB's designation of the bargaining unit by refusing to bargain and thereby "inviting" an unfair labor practice complaint that would give rise to a hearing at which the employer could challenge the claimed error. *Id.* at 288-89. *Accord Lane Council Govts v. Emp. Assn.*, 277 Or 631, 636-37, 561 P2d 1012 (1977).

In *OSEA v. Deschutes County*, 40 Or App 371, 595 P2d 501 (1979), the question of finality was raised again, but in the context of ERB having determined that a proposed bargaining unit was *not* appropriate. We wrote:

> "ERB's determination that a proposed bargaining unit is *appropriate* is not a final order, because that determination is only one step in the process leading to the certification (or noncertification) of a collective bargaining agent. *See Klamath Co. v. Laborers Inter. Union, supra* at 284-86.

> "* * * [However,] the determination before us is that the proposed unit is *inappropriate*, which, unlike a finding of appropriateness, is not an intermediate step; if it stands, nothing further takes place, and it is, therefore, the final step." *Id.* at 373-74 (emphasis in original).

Likewise, in the present case, we hold that the order is final, under ORS 183.310(5)(b) and ORS 183.480, because it is the last step in the process through which the April 1995

election results would be certified or not. It is ERB's definitive ruling on the viability of that election, and a conclusive determination of the right of the subject employees to choose OPEU as their exclusive representative *in that election*.[4] It is also a binding decision on the legal effect of OPEU's practice of collecting and hand delivering ballots. ERB's decision to order a new election "as soon as practicable," too, is not an intermediate ruling that could be challenged by employer at some later stage, because the only "later" stage would be after a second election, and both parties contend, albeit on different grounds, that had ERB disposed of this case properly, there would be no *need* for a second election. The order was not a "tentative or preliminary" declaration, ORS 183.310(5)(b), and no further action by ERB is required to dispose of this dispute over whether the challenged votes should be counted and whether the April 27, 1995, election should be certified or set aside. In sum, "no further action by ERB is required to give the order legal significance." *Reynolds School Dist. v. OSEA*, 58 Or App 609, 614, 650 P2d 119 (1982). As to this election, the process is complete. *See also Central Catholic Ed. Assn. v. Archdiocese of Portland*, 323 Or 238, 242-47, 916 P2d 303 (1996) (examining the definition of "final order" under an analogous statute).

We turn to the merits of OPEU's petition, which we review pursuant to ORS 183.482(7) and (8).

OPEU contends that ERB failed to apply its previously-established law to this case. *See* ORS 183.482(8)(b)(A), (B) (agency order must be set aside, modified or remanded if agency erroneously interpreted a provision of law; must be remanded if agency exercised its discretion in a manner that was "[i]nconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency"). The case to which OPEU draws our attention is *Employees of Motor Vehicles Division v. Oregon State Employees Association*, 5 PECBR 3069, 3073 (1980), in which ERB held that

---

[4] No Oregon appellate court has ever held that the mere availability of a subsequent election involving the same parties affects the determination of whether an order affecting the *current* election was final.

"[e]lections should not be set aside lightly, because to do so interferes with the orderly processes of labor relations. *If it may reasonably be said that proscribed conduct at an election* had an impact or *reasonably could have been expected to have an impact on the outcome of the election,* however, this Board shall set the election aside." (Emphasis supplied.)

The first question, then, and the one that is ultimately dispositive, is whether ERB applied that test before setting aside the election in this case.[5]

In its order, ERB summarized the stipulated facts and concluded that

(a)   this is the first election in which a party has made "a concerted effort to gain custody of voted ballots";

(b)   OPEU's collection and hand-delivery of ballots "caus[ed] a major portion of the electorate to ignore" ERB's instruction that voters return their ballots by mail;[6]

(c)   ERB "agree[s] with the general thrust of" employer's argument that OPEU's conduct "significantly interfered with the secret ballot process that is an essential component of the laboratory conditions necessary for a valid representation election";

(d)   "ballot solicitation by a party to an election is intrinsically coercive"; and

(e)   when a party to a representation election maintains custody of voted ballots, that conduct is "inherently destructive of the secret ballot process."

Under the two-part test articulated by ERB in *Employees of Motor Vehicles Division,* the first inquiry is whether the challenged conduct was "proscribed." Although ERB did not expressly conclude that OPEU's collection and

---

[5] Neither party disputes that the test enunciated in *Employees of Motor Vehicles* controls this petition. Thus, we do not address the propriety of that test.

[6] Given that specific instruction, it is of no moment that ERB's elections coordinator is guided by a manual that articulates no limits on the manner in which ballots can be returned by a voter in a mail ballot election.

delivery of ballot envelopes was proscribed conduct, its agreement with employer's argument that that conduct "significantly interfered with" an "essential component" of the election's "laboratory conditions" strongly suggests that ERB tacitly reached that conclusion. OPEU contends that, even if ERB applied the first part of the applicable test, the conclusion that it reached is entirely unsupported by the evidence and that the record supports only the *opposite* conclusion, *i.e.*, that OPEU's hand-delivery of ballots is *not* proscribed conduct.[7]

However, we need not decide whether ERB implicitly concluded that OPEU's conduct was "proscribed" and whether that ruling was in error, because even assuming that the first part of the *Employees of Motor Vehicles Division* test was satisfied, we conclude that the second part was not.

In its order, ERB again did not expressly apply the test, nor did it conclude that OPEU's conduct in this case "reasonably could have been expected to have an impact on the outcome of the election." As noted above, it stated only that collection and hand-delivery of ballots by a party is "intrinsically coercive" and "inherently destructive" of the "secret ballot concept." Even if ERB intended those conclusory statements to indicate its belief that the second prong of the test was satisfied, we agree with OPEU that nothing in the administrative record supports such a conclusion.

■ Employer argued to ERB that, when a party to an election gains possession of ballots, "[a]ll the normal safeguards built into the secret ballot election process have been clearly destroyed," and the election therefore is "automatically invalidate[d]." Rather than articulate what are the "normal safeguards" of an election and rather than require

---

[7] The stipulated record shows that in a previous election, ERB's elections coordinator allowed OPEU to deliver to a voter and then return to ERB the replacement/duplicate ballot of a voter who had failed to sign the envelope of the original ballot. In her affidavit, the elections coordinator acknowledges that allowing OPEU to hand-deliver a duplicate ballot is inconsistent with the procedure that is contained in ERB's internal manual. The record also shows that the elections coordinator expressly consented to OPEU's hand-delivery of large numbers of ballots in this case, and that OPEU has hand-delivered small numbers of ballots (ranging from one to "at least" four ballots) in prior mail elections without objection by ERB.

employer to explain how those safeguards were "destroyed" when OPEU gained custody of 343 ballot envelopes (which presumably were sealed, as there is no allegation to the contrary), ERB apparently accepted employer's contention that

> "[i]t is irrelevant whether [employer] can prove that [OPEU] actually did lose, destroy, or tamper with individual ballots; the mere fact that *[OPEU] had such an opportunity*, and the fact that it will never be known exactly what [OPEU] did after it gathered up all 343 ballots,[8] is sufficient to constitute conduct that 'reasonably could have been expected to have an impact' on the assurances of secrecy that are necessary in any election, but most especially in a mail ballot election." (Emphasis supplied.)

We agree with OPEU that mere "opportunity" for misconduct is an inadequate basis for ERB's sweeping conclusions that OPEU's conduct in the present case was "intrinsically coercive" and "inherently destructive" of the secret ballot process.

■ The record establishes only that ballots were sent to employees' homes and that a significant number of employees, ignoring ERB's voting instructions, chose to bring their ballot envelopes to work and give them to OPEU representatives rather than to place them in the mail. There was neither allegation nor evidence that OPEU's role was anything other than that of a carrier of sealed envelopes. There was no evidence that any employee felt pressured in any way, or that OPEU knew or could have known the vote that was cast in any of the ballot envelopes that it collected and delivered to ERB.[9] Finally, there is no allegation, much less evidence, that OPEU tampered with or failed to deliver any ballot entrusted to it. Thus, it cannot "reasonably be said that

---

[8] Employer does not explain why it could not learn which employees had given their ballots to OPEU and why it could not have asked those employees to compare the votes they cast with the ballots that were delivered by OPEU, to ascertain whether there had been any losses or tampering.

[9] Indeed, in a request that merely highlights the evidentiary deficit below, employer on review asks this court to take judicial notice of the fact that secrecy envelopes were not provided and that the envelopes into which voters placed their ballots were "at least partially transparent." Even if employer's intended or unintended implicit point that we should weigh evidence entailed a proper function for a *reviewing* court, we would decline the request because there are no sample ballots or ballot envelopes in the record on which any conclusion could be based.

[OPEU's] proscribed conduct * * * had an impact or reasonably could have been expected to have an impact on the outcome of the election[.]" *Employees of Motor Vehicles*, 5 PECBR at 3073.

Because there was insufficient evidence to satisfy ERB's own two-part test, we reverse the order setting aside the election and remand the case to ERB. We need not address OPEU's remaining assignments of error.

On petition, order setting aside election reversed and remanded for further proceedings not inconsistent with this opinion; cross-petition dismissed as moot.